Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 8023 | **DATE** | 8/9/2001 |
| **CASE TITLE** | Frank Grizzaffi, Jr. vs. DSC Logistics | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Because no group termination program existed, DSC was not required to abide by the additional requirements of section 626(h)(1)(H). DSC did comply with the requirements of sections 626(h)(1)(A)-(G), thereby making plaintiff's waiver knowing and voluntary. Because his waiver was knowing and voluntary, making his release agreement valid, he is barred from bringing a claim against DSC under the ADEA. We therefore grant DSC's motion for summary judgment (12-1). The status hearing set for 8/31/01 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 15 2001 | |
| | Notified counsel by telephone. | | date docketed | 28 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 01 AUG 13 AM 9: 15 | 8/9/2001 date mailed notice | |
| GL | courtroom deputy's initials | Date/time received in central Clerk's Office | GL mailing deputy initials | |



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
AUG 15 2001

FRANK GRIZZAFFI, JR.,        )
                             )
        Plaintiff,           )
                             )
    v.                       )   No. 00 c 8023
                             )
DSC LOGISTICS,               )
                             )
        Defendant.           )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Chief Judge:

Plaintiff Frank Grizzaffi, brought a complaint against defendant DSC Logistics ("DSC") pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §621 et. seq. ("ADEA"). He alleges one count of age discrimination and one count of retaliation, based on his termination and the failure of DSC to rehire him months later. DSC moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment. As explained below, we grant the motion.

## BACKGROUND

The following facts are undisputed. Plaintiff was an employee of DSC from September 25, 1984 until March 10, 2000, when he was terminated. Plaintiff was 56 years old when he was discharged. DSC is a third-party logistics provider and it's customers include long-term "public accounts." It's Melrose Park facility, where plaintiff was employed, consisted of five separate warehouse buildings, known as Buildings 1 through 5. At the time of his discharge, plaintiff was employed as a warehouse supervisor, working on two accounts, North American Logistics ("NALS") and Pillsbury. The NALS account occupied most of Buildings 1 and 2 (sometimes referred collectively to as Building 1) and utilized its own inventory control system called FSG



(finished goods system). In the fall of 1999, DSC lost the NALS account and subsequently, Building 1 became almost empty. DSC kept three of the warehouse supervisors - plaintiff, Gerald Williams and Bruno Sowinski - to work on the remaining small public accounts.

In early 2000, DSC learned that it would be losing another large account - Pillsbury. DSC then decided it would not renew its lease on Building 1. DSC consolidated the public accounts of Building 1 and management determined that these accounts could be served on two, rather than three, shifts. DSC then made the decision to keep Bruno Sowinski and Gerald Williams as the two shift supervisors, and to terminate plaintiff. On or about February 23, 2000, DSC human resources representatives met with plaintiff to advise him that his position was being eliminated and that he would be terminated effective March 10, 2000. They explained the need to move from three shifts to two due to the loss of business. Plaintiff was offered an individually tailored separation package, along with a release agreement and was advised to consult an attorney. Plaintiff signed the release, which provided that he would receive severance in the amount of $9,693.97, vacation pay for unused vacation, and any wages accrued prior to his termination date. It also provided that he was waiving any cause of action under the ADEA and that he had not been discriminated against on the basis of age.

## DISCUSSION

Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, we must evaluate the admissible evidence in the light most favorable to the nonmoving party. *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The party opposing the motion for summary judgment must affirmatively demonstrate that there is a genuine issue of material fact that requires trial. Fed. R. Civ. P. 56(e); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

2

verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). However, if the evidence is merely colorable, or is not sufficiently probative, the court may grant summary judgment. *Id.*, at 249-50.

The threshold question presented in this suit is whether the plaintiff is barred from bringing a claim against his former employer, DSC, because of the release that he signed. DSC contends that the release entered into by plaintiff is a valid, binding and enforceable release agreement and that for that reason he waived any ADEA claim he has against DSC.

An employee can waive an ADEA claim where the waiver is knowing and voluntary. See *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998). Such waivers are knowing and voluntary if they comply with the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f). The law provides that a waiver is enforceable when:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult an attorney prior to executing the agreement; and
>
> (F) (i) the individual is given a period of at least 21 days within which to consider the agreement; or (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 within which to consider the agreement;
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement...;

The waiver here tracked, almost exactly, these requirements. The release agreement was a simple, three-page document, written in clear language, and specifically referred to claims

3

under the ADEA. Plaintiff's termination claim arose before the agreement was executed. Plaintiff received over $9,000 in severance pay for signing the waiver, and acknowledged that this payment was in excess of any payments or benefits to which he was already entitled. Plaintiff was advised to consult with an attorney before executing the release, and did so. Finally, the release provided for a 21-day consideration period and a 7-day revocation period.

The question that we are now faced with is whether this waiver was requested in connection with some sort of exit incentive or other program offered to a group of employees. Section 626(f)(1)(H) states that:

> if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer...informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and (ii) the job titles and ages of all individuals eligible or selected for the program, and all the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

The plaintiff argues that the waiver he signed was requested in connection with an employee termination program, and that because the waiver did not comply with the requirements of section 626(f)(1)(H), the waiver is not enforceable. We must decide whether there is enough evidence of this to create a triable issue. In any dispute over whether the requirements of section 626(f)(1)(A)-(H) have been met, "the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary...." 29 U.S.C. § 626(f)(3).

In the context of ADEA waivers, there is a fundamental distinction between individually tailored separation agreements and employer programs targeted at groups of employees. Individual separation agreements are the result of actual or expected adverse action against an individual employee. *Campbell v. Amana Co., L.P.*, 125 F.Supp.2d 1129, 1133 (N.D.Iowa 2001). Courts have noted that adverse actions, in the form of job loss, are inevitable for some

4

people in reduction in force situations, and that the corporation is taking the action for general efficiency reasons. *Adams v. Ameritech Services, Inc.*, 231 F.3d 414, 421 (7th Cir.2000). The employee understands that the action is being taken against him, and he may engage in arms-length negotiation to resolve any differences with the employer. *Campbell*, 125 F.Supp.2d at 1133.

Group termination and reduction programs stand in stark contrast to the individual separation. The Seventh Circuit has said that "program" goes with "group or class," "Congress having thought that recipients of the kind of standardized, often complex, take-it-or-leave-it severance offers tendered in connection with a reduction in force or other reorganization should have more time in which and information with which to decide whether to waive their ADEA rights than in the case of individually negotiated separations." *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 670 (7th Cir.1998). The trademark of involuntary termination programs is a standardized formula or package of employee benefits that is available to more than one employee. *Campbell*, 125 F.Supp.2d at 1133.

Here, we have the termination of one, or at the most, two employees. Plaintiff claims that Silvio Restrepo, another supervisor, was also offered a severance package following the loss of the NALS account. He argues that this constituted a "downsizing" program.

The statute does not specify the size of the group or class, although the fewer the people terminated, the less likely it is that the offer to the members is pursuant to a program. *Blackwell*, 152 F.3d at 670. Though no court has found a definition for "group termination program," many courts have determined their existence. *See, e.g., Blackwell*, 152 F.3d at 671 (offer to leave was to an entire class of employees, the branch managers, not to individuals and the fact that there were only seven of them did not detract from the "programmatic" nature of the offer); *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679, 682 (7th Cir.1993) (finding that "sixty plus employees terminated at one time satisfies OWBPA's definition of a group

5

termination"); *Suhy v. AlliedSignal*, 44 F.Supp.2d 432, 435 (D.Conn.1999) (finding subsections '(F)(ii) and '(H) applicable to termination of forty employees in connection with reduction in force); *Butcher v. Gerber Prods. Co.*, 8 F.Supp.2d 307, 315 (S.D.N.Y.1998) (finding no dispute that mass discharge (over 300 employees) on one day "constitutes an 'employee termination program' under the OWBPA"); *Burch v. Fluor Corp.*, 867 F.Supp. 873 (E.D.Mo.1994) (finding term applicable to termination of four employees constituting twenty-five percent reduction in force).

Plaintiff was not terminated as part of a large scale reduction in force as occurred in many of the cases cited above. Rather, he was terminated because of a specific business occurrence - the loss of the NALS and Pillsbury accounts. The reduction in force - if it was one - was at the most a reduction of two employees. Even though we have found no cases finding a termination program existed when just two employees were fired, that does not mean that such a scenario is not possible. However, plaintiff has failed to present any facts to indicate that such a situation existed in the present case. DSC indicates that Restrepo's position was eliminated on December 1, 1999, immediately after the loss of the NALS account, and that plaintiff's job was not eliminated until March 10, 2000, after the loss of the Pillsbury account. Plaintiff does not dispute this fact. Individuals terminated at different times for different reasons can hardly be considered part of a group. More importantly, a group requires at least two people, and it is therefore impossible, by definition, for us to find that a group termination program existed when plaintiff was the only employee terminated at the time.

## CONCLUSION

Because no group termination program existed, DSC was not required to abide by the additional requirements of section 626(f)(1)(H). DSC did comply with the requirements of sections 626(f)(1)(A)-(G), thereby making plaintiff's waiver knowing and voluntary. Because his waiver was knowing and voluntary, making his release agreement valid, he is barred from

6

bringing a claim against DSC under the ADEA. We therefore grant DSC's motion for summary judgment. It is so ordered.

                                                                Marvin E. Aspen, District Court Judge

Dated: 8/9/01